**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**WILLIAM LONDUS BARNETTE,**

      **Plaintiff,**

**v.**                                   **Case No.: 3:12-cv-06102**

**CAROLYN W. COLVIN,**
**Acting Commissioner of the**
**Social Security Administration,**

      **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Claimant's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. This case is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 7, 10).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's motion for judgment on the pleadings be **DENIED**, that the Commissioner's motion for judgment

1

on the pleadings be **GRANTED**, and that this case be **DISMISSED**, **with prejudice,** and removed from the docket of the Court.

I. <u>**Procedural History**</u>

Plaintiff, William Londus Barnette ("Claimant"), filed the instant SSI and DIB applications on June 23, 2010, alleging a disability onset date of June 21, 2010. (Tr. at 133, 140). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 74, 90). Claimant filed a request for an administrative hearing, which was held on October 6, 2011 before the Honorable Brian LeCours, Administrative Law Judge ("ALJ"). (Tr. at 26-69). By written decision dated December 8, 2011, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 12-21). Claimant filed a request for review by the Appeals Council and submitted new evidence in support of his claim, which was incorporated into the administrative record. (Tr. at 4, 6-8, 405-68). The ALJ's decision became the final decision of the Commissioner on August 16, 2012, when the Appeals Council denied Claimant's request for review. (Tr. at 1-3). Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 1). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings, (ECF Nos. 5, 6), and both parties filed memoranda in support of judgment on the pleadings. (ECF Nos. 7, 10). Consequently, the matter is fully briefed and ready for resolution.

II. <u>**Claimant's Background**</u>

Claimant was 42 years old at the time he filed the instant applications for benefits and 43 years old at the time of his administrative hearing. (Tr. at 33, 133). He graduated from high school and communicates in English. (Tr. at 20, 33). His prior employment history includes work as a merchandiser at a discount department store. (Tr. at 166).

Claimant has a long history of mental health problems, for which he was hospitalized prior to his alleged onset date in 1993, 2004, and 2008. (Tr. at 218-23).

## III.   Summary of ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making

this determination, the next step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in *Id.* §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the first three functional areas (activities of daily living,

social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation of extended duration[1]) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental function. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). The Regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The

---

[1] Section 12.00(C)(4) of the Listing defines episodes of decompensation of extended duration as follows:

> Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace. Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two). Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode.

> The term repeated episodes of decompensation, each of extended duration in these listings means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks. If you have experienced more frequent episodes of shorter duration or less frequent episodes of longer duration, we must use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence

> decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant meets the insured status for disability insurance benefits through December 31, 2014. (Tr. at 14, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since June 21, 2010, the alleged onset date. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ determined that Claimant had the following severe impairments: "Major Depressive Disorder with psychotic features; Obsessive Compulsive Disorder; and Anxiety Disorder." (Tr. at 14-15, Finding No. 3). Under the third inquiry, the ALJ determined that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 15-16, Finding No. 4). Accordingly, under the fourth inquiry, the ALJ assessed Claimant's RFC, finding that:

> The claimant has no physical limitation of function. Mentally, all work must involve simple routine tasks involving no more than simple, short instructions and simple work-related decisions with few work place changes; no work at fixed production rate pace; only occasional interaction with the general public; only occasional interaction with co-workers; and only occasional interaction with supervisors.

(Tr. at 16-19, Finding No. 5). The ALJ determined that Claimant was unable to perform any past relevant work. (Tr. at 19, Finding No. 6). The ALJ then reviewed Claimant's past work experience, age, and education in combination with his RFC to determine his ability to engage in substantial gainful activity. (Tr. at 19-21, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1968 and was defined as a younger individual; (2) he had at least a high school education and could communicate in

English; and (3) transferability of job skills was not material to the ALJ's determination that Claimant was "not disabled." (Tr. at 19-20, Finding Nos. 7-9). Given these factors and Claimant's RFC based on all of his impairments, the ALJ relied upon the testimony of a vocational expert in finding that Claimant could perform jobs at all exertional levels, which were available in significant numbers in the national economy. (Tr. at 20-21, Finding No. 10). The ALJ found that Claimant was able to perform the jobs of general laborer at the heavy level; material handler and hand packer at the medium level; marker/labeler and grader/sorter at the light level; and hand assembler and hand packer at the sedentary level. (Tr. at 20). Therefore, the ALJ concluded that Claimant was not disabled and, thus, was not entitled to benefits. (Tr. at 21, Finding No. 11).

## IV.   **Claimant's Challenge to the Commissioner's Decision**

Claimant argues that the Commissioner's decision is not supported by substantial evidence in light of new and material information submitted after the ALJ's decision but prior to the Appeals Council's review. (ECF No. 7 at 5). Specifically, Claimant alleges that if his emergency medical and psychological treatment records from December 23, 2011 and February 16, 2012 had been available to the ALJ, the decision may have been different. (*Id.* at 7). In response, the Commissioner contends that the records are not relevant to the time period in question and are not material in that they do not demonstrate disabling limitations.

## V.   **Relevant Medical History**

### A. Prestera Treatment Notes

Between May 2009 and October 2011, Claimant received mental health counseling and treatment from the Prestera Centers for Mental Health. (Tr. at 276-404). On May 5, 2009, the date of intake, Claimant reported experiencing "symptoms of

obsessive compulsive disorder including depression, low energy, recurrent and persistent intrusive thoughts that interfere with his daily job performance and relationship" as well as "hostility, poor concentration, [and] failed attempts to ignore or control these thoughts/impulses." (Tr. at 384). He was diagnosed with obsessive compulsive disorder and assessed a Global Assessment of Functioning ("GAF") score of 65.[2] (Tr. at 387).

On June 4, 2009, Kambiz Soleymani, M.D. at Prestera conducted a Comprehensive Diagnostic Psychiatric Evaluation of Claimant. (Tr. at 373-79). In his history of present illness, Claimant reported having "problems with anxiety, isolating himself, worried that people talk about him, having poor self-esteem and bouts of helplessness and hopelessness," and that he "continue[d] to ruminate about things, mostly religious issues and second guessing constantly." (Tr. at 373). In the mental status evaluation, Claimant described his mood as "worried and depressed" while Dr. Soleymani observed that his "[a]ffect was constricted and congruent with mood." However, Claimant's orientation, eye contact, speech, thought processes, memory and concentration, insight and judgment were unremarkable, while his intelligence estimate "appeared to be low average." (Tr. at 374). Although Claimant reported prior auditory hallucinations in 2002, he denied any current or recent auditory or visual hallucinations. (*Id.*). Accordingly, Dr. Soleymani diagnosed Claimant with OCD; R/O Major Depressive Disorder, severe with psychotic features; and Generalized Anxiety

---

[2] The GAF scale is a tool for rating a person's overall psychological functioning on a scale of 0-100. This rating tool was adopted by the American Psychiatric Association in its *Diagnostic and Statistical Manual of Mental Disorders (DSM) IV-Text Revision,* although the scale was eliminated in the recently published DSM-5. A GAF score between 61-70 indicates some mild symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g. occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.

Disorder. (Tr. at 374-75). Dr. Soleymani assigned Claimant a GAF score of 55-60,[3] and noted his prognosis of "Guarded." (Tr. at 375).

Between July 2009 and September 2010, Claimant received approximately monthly treatment at Prestera. (Tr. 343-72). Between July 2009 and April 2010, Claimant experienced some difficulties with religious obsession, intrusive thoughts, and poor sleep, but his condition improved with periodic adjustments to his medication. (Tr. at 360-72). In January 2010, Claimant reported that he "has been doing real well" and "feels combination of meds are working well," as he denied experiencing intrusive thoughts, "hyperreligiosity," demonic thoughts, sadness or depression. (Tr. at 365). In March 2010, Claimant "reported doing well but he want[ed] to taper off medication because of weight gain and increased cholesterol." (Tr. at 364). Accordingly, he and the therapist discussed possible future medication adjustments. (*Id.*). In April 2010, Claimant reported that he was "doing fine," denied experiencing audio-visual hallucinations, and his mood was good. (Tr. at 363). The psychologist assigned Claimant a GAF score of 60-65. (Tr. at 360).

In early May 2010, Claimant first reported increased difficulties with intrusive thoughts and his mind racing. (Tr. at 359). Claimant's therapist observed that his mood was low, affect was tearful, and he had negative cognition—religious preoccupation. (*Id.*). However, Claimant was alert, his speech and motor activity were normal, and he denied suicidal or homicidal ideations and audio or visual hallucinations. (*Id.*).

---

[3] GAF scores between 51 and 60 indicate "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 34.

Claimant was assigned a GAF score of 50[4] and his medication was adjusted. (*Id.*). Claimant's "mental rituals," "bad intrusive thoughts" and feelings of depressions persisted through June 2010, during which his therapist worked with him to adjust his medication. (Tr. at 355-57). During this time, Claimant's mood was low, while his affect was constricted of labile, and his GAF score was assessed at 50 and 55. (*Id.*). On June 22, 2010, the day after Claimant's alleged onset date, he reported feeling depressed and hearing voices telling him "bad things," such as to "push wife's hand in oven," which he resisted acting upon. (Tr. at 355).

In July 2010, Claimant began to experience a sustained improvement that continued through January 2011. (Tr. at 317-54). Between August 2010 and January 2011, Claimant regularly reported doing better with his intrusive thoughts, and experiencing good sleep, improved mood, no hallucinations, and increased coping skills. (Tr. at 317-51). Throughout this period, Claimant's mental status evaluations were largely unremarkable, while his GAF score was consistently assessed at 65. (*Id.*).

In February and March 2011, Claimant again reported problems with depression, anxiety, intrusive thoughts, and symptoms of OCD. (Tr. at 302, 307-15). In late March 2011, Dr. Kazi adjusted Claimant's medication after observing perseveration in his thought content, deficient coping ability, restricted affect, and assigned Claimant a GAF score of 60. (Tr. at 303-06). Thus, in April 2011, Claimant reported "a reduction in persistent and intrusive thoughts . . . following a change in his medication by Dr. Kazi." (Tr. at 300). Claimant also felt less anxious and continued to develop his coping skills to deal with his depression, anxiety, and OCD behavior. (Tr. at 299-301). In late April 2011,

---

[4] A GAF of 41-50 indicates serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job). On the GAF scale, a higher score indicates a less severe impairment.

Claimant reported new symptoms of mania with rapid mood swings, low energy, and an increase in hyperactivity, although he was again assigned a GAF score of 60. (Tr. at 293, 295). However, four days later, Claimant reported that "he [wa]s doing good" with less intrusive thoughts, okay mood, and good sleep. (Tr. at 276). Claimant's final mental statue evaluation was unremarkable, while his GAF score remained at 60. (Tr. at 276-79).

On June 28, 2011, Claimant's treating psychiatrist, Noor Ahmed Kazi, M.D., handwrote a letter "for Social Security Purpose Only" on a prescription slip, stating that Claimant was "under [his] care for MDD with psychotic features v/s Schizo affective disorder." (Tr. at 388). Dr. Kazi asserted that Claimant "may not be able to work full time for about a year or more" and that "[h]e needs regular medication follow up and therapy." (*Id.*). Dr. Kazi further stated that this note was written at Claimant's request. (*Id.*). On October 25, 2011, Dr. Kazi provided a second statement as to Claimant, in which he described Claimant's history of mental illness and related symptoms, and affirmed that "[h]e has been on different antipsychotics and SSRI's with moderate success." (Tr. at 404). Dr. Kazi again opined that Claimant "needs regular medication and therapy, avoid stress, and regular follow-ups to avoid further relapse." (*Id.*).

### B. Psychological Mental Profile

On August 12, 2010, licensed psychologist Mareda L. Reynolds, M.A., conducted a neuropsychological mental profile of Claimant, which consisted of a clinical interview regarding Claimant's medical history and presenting problems; a mental status examination; and two standardized psychological tests. (Tr. at 245-50).

During the interview, Claimant reported suffering from "obsessive compulsive disorder, depression, anxiety, memory, [and] concentration problems." (Tr. at 245). He

described experiencing obsessive thoughts about his religion, having bad thoughts of hurting people, and praying 10 to 20 times per day. (Tr. at 246). Claimant reported prior hospitalization for mental health treatment in 1993 and in 2008. (Tr. at 247).

During the mental status evaluation, Ms. Reynolds observed that Claimant's social interaction was mildly impaired, but that his eye contact was good and length and depth of verbal responses were adequate. (Tr. at 248). Claimant's affect was flat and he seemed somewhat sedated, but his mood was neutral. (*Id.*). His insight was poor, but his judgment appeared adequate. (*Id.*). His recent memory was mildly impaired based on his COGNISTAT results, but his immediate memory and remote memory were within normal limits or otherwise adequate. (*Id.*). Claimant's concentration/attention and persistence/pace were mildly impaired. Significantly, with respect to Claimant's thought processes, Ms. Reynolds observed that Claimant "denied hallucinations, delusions, obsessions and compulsions at this time," he "did not appear to be responding to any internal stimuli," and "[t]here was no evidence of circumstantiality, flight of ideas, tangentiality, word salad or neologisms." (*Id.*).  Claimant also denied any homicidal or suicidal ideations. (*Id.*).

On the Wechsler Adult Intelligence Scale (WAIS-IV), Claimant scored 78, 94, 84, and 84 for verbal comprehension, perceptual reasoning, working memory, and processing speed, respectively, while his full scale IQ was assessed at 81. (Tr. at 249). However, these scores were "considered to be an underestimate of his intellectual abilities due to the severity of his psychological symptoms" as Claimant "had difficulty maintaining attention and appeared confused by the questions at times." (*Id.*). On the Cognitive Status Exam (COGNISTAT), Claimant's level of consciousness, orientation, comprehension, repetition, naming, memory, calculations, similarities and judgment

were all average, while his attention and constructions were mildly deficient. (Tr. at 249-50). The results of the COGNISTAT were considered valid. (Tr. at 250).

Based upon the foregoing, Ms. Reynolds diagnosed Claimant with schizoaffective disorder. (Tr. at 250). In the summary and rationale for diagnosis, Ms. Reynolds observed that Claimant "presents with a history of hallucinations and delusional thinking" and that he "reported a history of depressive episodes." (*Id.*). Claimant had "mild impairments in attention/concentration and recent memory" but his prognosis was fair. (*Id.*).

### C. Psychiatric Review Techniques

On August 30, 2010, Dr. Jeff Boggess, Ph.D. conducted a psychiatric review technique of Claimant, based upon the evaluation by Ms. Reynolds and mental health treatment records of Claimant dating back to 2008. (Tr. at 251-64). Dr. Boggess opined that Claimant's impairment was severe but not expected to last 12 months. (Tr. at 251). Dr. Boggess diagnosed Claimant with schizoaffective disorder and obsessive compulsive disorder. (Tr. at 254, 256). He opined that Claimant was mildly limited in his activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. (Tr. at 261). Dr. Boggess observed that more recently Claimant had "show[n] some deterioration with obsessive thoughts," but that "Claimant has history of good functioning with med, and is currently undergoing some med changes." (Tr. at 263). Thus, Dr. Boggess concluded that "Claimant should improve to baseline levels with continued treatment." (*Id.*).

On January 15, 2011, Dr. Jeff Harlow, Ph.D. concluded that "[a]lthough there is evidence in file of new treatment for mental illness, review of this 11/17/10 evidence from Prestera Center East indicates that the initial [Psychiatric Review Technique

Form] is still an accurate assessments *[sic]* of the claimant's ability to work." (Tr. at 275). Thus, Dr. Harlow affirmed the August 30, 2010 Psychiatric Review Technique assessment "on the basis of analysis of evidence in file." (*Id.*).

### D. New Evidence

#### 1. December 23, 2011 Emergency Room Records

On December 23, 2011, Claimant was admitted to CAMC Teays Valley Hospital, (Tr. at 406-58), with complaints of "difficulty breathing over the past 2 weeks." (Tr. at 413). Claimant reported that his breathing difficulties were "intermittent and worse from lying down or sitting up," and stated that "he ha[d] been under a lot of stress over the past few weeks as well." (*Id.*). Claimant's review of systems, physical examination, and laboratory results were unremarkable, while a chest x-ray revealed "no acute cardiopulmonary process." (Tr. at 413-14, 417). Claimant received 1mg of Ativan, which made him "feel much better." (Tr. at 414). Although Claimant "was concerned that this may be a panic attack," the treating physician was "unsure [of] the etiology of the patient's complaint." (*Id.*). Thus, Claimant was diagnosed with "dyspnea of unknown etiology" and discharged in stable condition that same day. (*Id.*).

#### 2. February 2012 Inpatient Treatment Records

On February 16, 2012, Claimant was admitted to River Park Hospital, (Tr. at 460-68), with "delusions which [were] hyper religious in nature." (Tr. at 464). In Claimant's History of Present Illness, Claimant reported feeling "extremely anxious, fearful and tearful" and "describe[d] intrusive thoughts that he is unable to manage." (*Id.*). Dr. Mark Hughes, M.D., observed that Claimant "was experiencing thought blocking" and his [r]eality testing was grossly impaired." (*Id.*). Claimant reported that although he had been taking medication, he had recently discontinued Haldol, as a result of "a

misunderstanding between him and his doctor." (*Id.*).

Claimant's mental status evaluation reflected that he was "extremely anxious, sad and worried." (Tr. at 465). He had a "depressed mood with anxious affect" and "mild hyperkinesis" (restless pacing). (*Id.*). Claimant's "[t]hought process was logical and goal directed" and his "[t]hought content was without hallucinations." (*Id.*). However, he was "having a great deal of delusional thought with breakdown in reality testing," with most of his delusional thoughts being religious in nature. (*Id.*). Accordingly, his impulse control, insight and judgment were "impaired by his psychosis." (*Id.*). Claimant's intelligence, speech, gait, attitude, orientation, memory, and abstracting abilities all appeared to be intact or otherwise unremarkable. (*Id.*). Claimant was diagnosed with Schizoaffective Disorder and assigned a GAF score of 40.[5] (Tr. at 465).

During the course of his hospitalization, Claimant was closely monitored and received regular medication adjustments. (Tr. at 460-61). Claimant attended individual and group therapy sessions, during which Claimant addressed his "[a]ltered thought processes and poor coping skills." (Tr. at 461). On February 28, 2012, Claimant's wife "expressed a belief that patient's anxiety had decreased significantly and that patient was reporting less frequent intrusive religiosity." (*Id.*).

On February 29, 2012, Claimant was discharged from River Park Hospital. (Tr. at 460). That day, Claimant attended a family therapy session with his therapist and mother, during which they discussed Claimant's treatment progress and plans for

---

[5] A GAF score of 31-40 indicates that the patient had some impairment in reality testing or communication (e.g. speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g. depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).

discharge. (Tr. at 461). Claimant "expressed a belief that his mood had significantly improved since admission and he stated that his anxiety and intrusive thoughts had decreased." (Tr. at 462). Claimant also stated that he was "less focused on religious beliefs and questions about his faith and that his suicidal thoughts have completely resolved since admission." (*Id.*). Thus, upon discharge, Claimant was "calm and cooperative," while his "mood, sleep, appetite and behavior were stable and regular," and his "remaining religious delusions appear[ed] to be his baseline." (*Id.*). At the time of discharge, Claimant was diagnosed with schizoaffective disorder bipolar type and assessed with a GAF score of 65 to 70. (Tr. at 462-63).

## VI.   <u>Standard of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson,* the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the totality of the record and determine whether substantial evidence exists to support the conclusion of the Commissioner. *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir. 1990). Thus, the decision for the Court to make is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart,* 434 F.3d 650,

653 (4th Cir. 2005) (citing *Craig v. Chater,* 76 F.3d 585, 589 (4th Cir. 2001)). If substantial evidence exists, then the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.  <u>Discussion</u>

Claimant asserts that the Commissioner's decision denying his applications was not supported by substantial evidence in light of the December 2011 and February 2012 medical records, which he submitted after the issuance of the ALJ's decision, but prior to the Appeals Council's review. (ECF No. 7 at 5). Claimant contends that these records warrant a remand pursuant to sentence four of 42 U.S.C. § 405(g), although he argues the framework for remand applicable to sentence six of the statute in his memorandum. (*Id.*at 6). Inasmuch as Claimant seeks a remand based upon records reviewed and incorporated by the Appeals Council, sentence four, rather than sentence six, is the correct standard here.

The Court may remand the Commissioner's decision for a rehearing under sentence four or sentence six of 42 U.S.C. § 405(g). A sentence four remand is appropriate when the Commissioner's decision is not supported by substantial evidence, the Commissioner incorrectly applies the law when reaching the decision, or the basis of the Commissioner's decision is indiscernible. *Brown v. Astrue,* Case No. 8:11–03151–RBH–JDA, 2013 WL 625599 (D.S.C. Jan. 31, 2013) (citations omitted). If new and material evidence is submitted after the ALJ's decision, the Appeals Council:

> shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision. The Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the administrative law judge hearing decision. It will then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record.

20 C.F.R 404.970(b). When the Appeals Council incorporates new and material evidence into the administrative record, and nevertheless denies review of the ALJ's findings and conclusions, the issue before the Court is whether the Commissioner's decision is supported by substantial evidence in light of "the record as a whole including any new evidence that the Appeals Council specifically incorporated into the administrative record." *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011) (remanding for rehearing pursuant to sentence four of 42 U.S.C. § 405(g)) (quoting *Wilkins v. Secretary, Dept. of Health and Human Services*, 953 F.2d 93, 96 (4th Cir. 1991) (internal marks omitted)). If the ALJ's decision is flawed for any of the reasons stated, the Court may remand the matter for a rehearing under sentence four.[6]

On the other hand, sentence six applies to a remand based upon new and material evidence supplied to the Court, which was not submitted to the ALJ or the Appeals Council and was not considered in reaching the Commissioner's final disability decision. *Cameron v. Astrue,* No. 7:10CV00058, 2011 WL 2945817, at *7 (W.D.Va. July 21, 2011) ("Sentence six applies specifically to evidence not incorporated into the record by either the ALJ or the Appeals Council."). The sixth sentence of 42 U.S.C. § 405(g) provides that the Court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding. . ." 42 U.S.C. § 405(g).Remand to the

---

[6] Sentence four allows the court to "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

Commissioner on the basis of newly discovered evidence is appropriate if four prerequisites are met:

> (1) the evidence must be relevant to the determination of disability at the time the application(s) was first filed; (2) the evidence must be material to the extent that the Commissioner's decision might reasonably have been different had the new evidence been before him; (3) there must be good cause for the claimant's failure to submit the evidence when the claim was before the Commissioner; and (4) the claimant must make at least a general showing of the nature of the new evidence to the reviewing court.

*Miller v. Barnhart*, 64 Fed.Appx. 858, 859-06 (4th Cir. 2003); *see also* 42 U.S.C. § 405(g); *Borders v. Heckler,* 777 F.2d 954, 955 (4th Cir. 1985).

In this case, the Appeals Council considered the additional records, but concluded that they did not provide a basis for changing the ALJ's decision. Having reviewed the record as a whole, the undersigned agrees with the Appeals Council. While the additional records substantiate that Claimant continued to suffer from mental illness after the ALJ's decision, the records do not justify a finding that the ALJ's determinations were "contrary to the weight of the evidence currently of record." 20 C.F.R. § 404.970(b).

In his decision denying benefits, the ALJ carefully reviewed the records of Claimant's treating psychologists at Prestera, the evaluation of Mareda Reynolds, the Psychiatric Review Technique opinions of Dr. Boggess and Dr. Harlow, and Claimant's own testimony and reports. (Tr. at 18-19). As discussed in the ALJ's decision, "treatment notes from Prestera covering the period from May 2009 through May 2011 indicate[d] that the claimant [was] doing better." (Tr. at 18). Ms. Reynolds observed only mild impairments in Claimant's attention/concentration, memory, and persistence/pace. (Tr. at 18-19). The ALJ found Claimant to be "not fully credible regarding the frequency and severity of his symptoms" in light of the medical evidence and Claimant's own

statements regarding his activities of daily living. (Tr. at 19). Likewise, the ALJ rejected Dr. Khazi's opinion that Claimant "may not be able to work full time for about a year or more" because it was vague, conclusory, not linked to function, and conflicted with both the record as a whole and Dr. Khazi's own records. (Tr. at 19). In contrast, the ALJ found Dr. Boggess's opinion to be persuasive, as it "appears to be a more accurate reflection of the claimant's functional ability and accords with the running treatment records." (Tr. at 19). In his psychiatric review technique, Dr. Boggess observed that "Claimant has history of good functioning with med, and is currently undergoing some med changes," and further opined that Claimant "should improve to baseline levels with continued treatment." (Tr. at 263).

The records documenting Claimant's December 2011 emergency room visit at CAMC Teays Valley Hospital ("TVH") do not contradict the ALJ's findings or conclusions. (Tr. at 406-58). In the TVH records, the only indications of mental impairment appear in Claimant's subjective descriptions of his history of present illness and past medical history. (Tr. at 413). However, in Claimant's physical examination, the physician observed that Claimant was "alert and oriented x3" and had "no focal motor or sensory deficit." (Tr. at 413-14). Although Claimant "was concerned that [his difficulty breathing] may be a panic attack," the treating physician was "unsure the etiology of the patient's complaint" and thus diagnosed Claimant with "dyspnea of unknown etiology." (Tr. at 414). Claimant was discharged in stable condition the same day as his admittance. (Tr. at 414, 418). Claimant argues that these new records reflect "anxiety related symptoms, including shortness of breath, over a period of two weeks." (ECF No. 7 at 7). However, there are no objective findings or medical conclusions supporting this characterization of Claimant's hospital visit. Furthermore, Claimant himself reported

that he had only experienced "difficulty breathing over the past 2 weeks." (Tr. at 413). These records do not contradict the ALJ's decision because, rather than demonstrating chronic debilitating anxiety, the TVH records reflect a relatively isolated instance of difficulty breathing, which was quickly treated and easily controlled with medication. (Tr. at 414).

Claimant's records from the February 2012 River Park hospitalization are more material than the TVH records, but similarly do not provide a basis for remand. (Tr. at 460). Although Claimant was initially assessed with a GAF score of 40, and he reported a worsening of many of the symptoms he regularly experienced, including hyper-religious delusions, anxiety, and intrusive thoughts, (*id.*), the treatment notes indicate that Claimant's condition had only recently declined. Significantly, his decompensation corresponded temporally with his discontinuation of Haldol, an antipsychotic medication that he stopped taking due to "a misunderstanding between him and his doctor." Without Haldol, Claimant's "psychotic symptoms ha[d] worsened to the point that he was felt to be at least a passive danger to self and in need of inpatient treatment for medication adjustment." (Tr. at 464). After medication adjustments and individual and group therapy sessions, Claimant reported a substantial improvement in his mood and a decrease in anxiety and intrusive thoughts. (Tr. at 461-62).

From a longitudinal perspective, the evidence of record demonstrates that Claimant periodically requires hospitalization for acute exacerbations of his psychiatric symptoms. Since 1993, Claimant has been admitted to River Park Hospital on four occasions, each occurring at least three years apart. Three of the admissions happened while Claimant was employed, and after these admissions, Claimant returned to work. His 2012 admission was attributed to a medication mix-up, a conclusion that is

corroborated by Claimant's clinical records, which reflect mild and relatively stable symptoms when Claimant is properly medicated. At the time of his discharge in 2012, Claimant was assessed with a GAF score of 65 to 70, indicative of mild symptoms, and his religious delusions had returned to baseline. (Tr. at 462-63). Thus, rather than supporting a conclusion that Claimant's mental impairments were incapacitating during the relevant time period, Claimant's River Park Hospital records suggest that his baseline condition and functionality had been relatively high until shortly before his February 2012 admission and returned to normal when his medications were adjusted. (Tr. at 468). As Claimant's symptoms can be reasonably controlled with medication, they are not disabling. *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986). Consequently, the River Park records support the ALJ's determination that although Claimant's mental impairments are severe, his baseline functional limitations do not preclude sustained employment.

For these reasons, the undersigned **FINDS** that the ALJ's decision is supported by substantial evidence on the administrative record, despite the December 2011 and February 2012 treatment records. Therefore, remand is not appropriate under sentence four of 42 U.S.C. § 405(g).

## VIII.  Recommendations for Disposition

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the District Court confirm and accept the findings herein and **RECOMMENDS** that the District Court **DENY** Plaintiff's motion for a remand as articulated in his Brief in Support of Judgment on the Pleadings, (ECF No. 7), **GRANT** Defendant's Motion for Judgment on the Pleadings, (ECF No. 10), and **DISMISS** this action, with prejudice, from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:**  August 13, 2013.

Cheryl A. Eifert
United States Magistrate Judge

23