IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION


WILLIAM LONDUS BARNETTE,

                Plaintiff,

v.                                            CIVIL ACTION NO. 3:12- 06102

CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,

                Defendant.


**MEMORANDUM OPINION AND ORDER**

This action was referred to the Honorable Cheryl A. Eifert, United States Magistrate Judge, who has submitted her proposed findings of fact and recommendations for disposition pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B). The Magistrate Judge's Proposed Findings and Recommendations, ECF No. 11, were filed on August 13, 2013, and Plaintiff's objections to the Proposed Findings and Recommendations, ECF No. 12, were filed on August 23, 2013.

The Court has reviewed *de novo* those portions of the Magistrate Judge's Findings and Recommendations to which Plaintiff objects, and it finds that Plaintiff's objections lack merit. For the reasons set forth below, the Court **ADOPTS** the Proposed Findings and Recommendations of the Magistrate Judge, **DENIES** Plaintiff's motion for summary judgment as articulated in his brief, ECF No. 7, **GRANTS** Defendant's motion for summary judgment as articulated in her brief, ECF No. 10, and **AFFIRMS** the final decision of the Commissioner of the Social Security Administration.

## I.      Background

On June 23, 2010, Plaintiff, William Londus Barnette, filed his application for disability insurance benefits and supplemental security income, alleging a mental disability with an onset date of June 21, 2010. R. at 133, 140. On December 8, 2011, after a hearing was held in the case, the Administrative Law Judge (ALJ) issued a ten-page decision which ultimately held that Plaintiff was not "disabled" as required by sections 216(i), 223(d), and 1614(a)(3)(A) of the Social Security Act. *Id.* at 12-21. On February 7, 2012, Plaintiff filed a request for review of the ALJ's decision by the Appeals Council and submitted new evidence in support of his claim. *Id.* at 4, 6-7, 405-86. On August 16, 2012, the Appeals Council incorporated the new evidence into the administrative record but denied Plaintiff's request for review. *Id.* at 1-4. Plaintiff then filed the instant action, arguing that the ALJ's decision is not supported by substantial evidence in light of the new evidence submitted to the Appeals Council. Pl.'s Brief Supp. Compl. 1, 5. In her Proposed Findings and Recommendations, the Magistrate Judge found that the ALJ's decision is supported by substantial evidence in the record, despite the inclusion of the new evidence. Proposed Findings & Recommendations at 22. Plaintiff then filed the instant Objections to the Proposed Findings and Recommendations.

## II.      Standard of Review

The Social Security Act states that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). The U.S. Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks omitted). The Fourth Circuit has clarified that such evidence "consists of more than a mere scintilla of evidence but [it] may be less than a

preponderance." *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation marks omitted).

In reviewing the record in a case for substantial evidence, a court must "not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the ALJ." *Id.* (brackets omitted) (internal quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ," not the reviewing court. *Id.* (brackets omitted) (internal quotation marks omitted). Thus, even if the Court would have reached a different decision, it must nonetheless "uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." *Id.* (brackets omitted) (internal quotation marks omitted).

The Fourth Circuit explains the five-step process which the Commissioner uses to evaluate disability claims as follows:

> [T]he Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy. *See* 20 C.F.R. § 416.920(a)(4). The claimant has the burden of production and proof in Steps 1–4. At Step 5, however, the burden shifts to the Commissioner to produce evidence that other jobs exist in the national economy that the claimant can perform considering her age, education, and work experience. If a determination of disability can be made at any step, the Commissioner need not analyze subsequent steps. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

*Id.* at 472-73 (brackets omitted) (citations omitted) (internal quotation marks omitted).

### III.    Analysis

Plaintiff asserts that the Magistrate Judge "committed error in finding that [Plaintiff's] 'baseline functional limitations do not precluded [sic] sustained employment.'" Pl.'s Objections

3

at 1. He further asserts that "[t]here is no substantial evidence which justifies a disregard for [Plaintiff's] testimony regarding his symptoms." *Id.* In support of these claims, Plaintiff asserts that the ALJ committed error by not analyzing Plaintiff's ability to manage the household finances, do laundry, and care for goats "in a suitable manner, consistently, usefully, routinely, or without undue interruptions or distractions," as required when reviewing a person's "activities of daily living" under listing 12.00(C)(1). *Id.* at 1-2. Plaintiff asserts that listing 12.00 also requires a person's "social functioning" to be analyzed by examining that person's capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals. *Id.* at 2. He claims that the ALJ incorrectly failed to address whether Plaintiff is able to "maintain social functioning on a sustained basis with other individuals." *Id.* In summary, Plaintiff asserts that the ALJ's analysis of "the paragraph B criteria is in complete contradiction to the evidence established through [Plaintiff's] testimony and treatment records." *Id.*

First, to the extent Plaintiff objects to the ALJ's "disregard" of Plaintiff's testimony regarding his symptoms or to a contradiction between his testimony and the ALJ's findings, the Court may not reassess *de novo* the ALJ's credibility determinations or substitute its judgment for that of the ALJ. Regarding the extent of a court's ability to review an ALJ's credibility determination, the Fourth Circuit has clarified that "[i]f the ALJ discredits the claimant's testimony, he must give specific reasons that are grounded in the evidence." *Fisher v. Barnhart*, 181 F. App'x 359, 363 (4th Cir. 2006) (internal quotation marks omitted).

Here, the ALJ dedicated eight paragraphs to describing the evidence underlying his determination that Plaintiff's statements were less than fully credible. R. at 17-19. After detailing Plaintiff's self-reported activities, history, and symptoms, and the evaluations of four different doctors, therapists, and/or treatment centers, the ALJ explicitly found that Plaintiff's "statements

4

concerning the intensity, persistence and limiting effects of [his] symptoms *are not credible* to the extent they are inconsistent with the above residual functional capacity assessment[1] [as outlined by the ALJ, using evidence derived from the analysis of mental health professionals].” *Id.* at 18 (emphasis added). The ALJ found Plaintiff “*not fully credible* regarding the frequency and severity of his symptoms.” *Id.* at 19 (emphasis added). He then clarified:

> [Plaintiff’s] treatment is modest when compared to his reports of disabling limitations of function. His testimony is not consistent with the medical evidence, which shows much-improved symptoms . . . . Despite his mental health allegations, [Plaintiff] is able to drive, wash clothes, handle the household finances, feed and water his goats, and care for his personal hygiene needs. He attends church three times a week and enjoys watching television, reading, and working puzzles.

*Id.* Given the inconsistencies between 1) the two Function Reports submitted by Plaintiff on June 30, 2010, and November 5, 2010, 2) the Function Reports and Plaintiff’s own testimony at the hearing on October 6, 2011, 3) Plaintiff’s statements to medical professionals and Plaintiff’s testimony, and 4) the medical and psychological evaluations of Plaintiff and Plaintiff’s testimony, the Court **FINDS** that there is substantial evidence in support of the ALJ’s finding that Plaintiff’s statements in the record are not fully credible. *Id.* at 32-62, 176-85, 203-10.

Plaintiff’s remaining objection is less clear. His brief focuses upon two criteria—“activities of daily living” and “social functioning”—under the paragraph B portion, as defined in listing 12.00, of the analysis of whether a claimant has an impairment that meets or equals the requirements of a listed impairment. Thus, the Court reads Plaintiff’s final objection as an objection to the ALJ’s analysis under these two criteria of this specific subsection of step three of the five-step process which the Commissioner uses to evaluate disability claims.

---

[1] The ALJ’s residual functional capacity assessment of Plaintiff consisted of two findings regarding Plaintiff’s functional limitations: 1) Plaintiff has “no physical limitation,” and 2) “[m]entally, all [of Plaintiff’s] work must involve simple routine tasks involving no more than simple, short instructions and simple work-related decisions with few work place changes[,] no work at fixed production rate pace[,] only occasional interaction with the general public[,] only occasional interaction with co-workers[,] and only occasional interaction with supervisors.” R. at 16.

As explained above, step three consists of determining whether a claimant has an impairment that meets or equals the requirements of a listed impairment. Such listings are found in Appendix 1 to Subpart P of § 404 of Title 20 of the Code of Federal Regulations. Mental disorder listings fall under listing 12.00, which, before dividing up into multiple disorder-specific listings, includes an introductory section explaining how to determine whether a claimant has an impairment that meets or equals the requirements of a listed mental disorder impairment. It states, in pertinent part:

> The evaluation of disability on the basis of mental disorders requires documentation of a medically determinable impairment(s), consideration of the degree of limitation such impairment(s) may impose on your ability to work, and consideration of whether these limitations have lasted or are expected to last for a continuous period of at least 12 months. The listings for mental disorders are arranged in nine diagnostic categories . . . [including] affective disorders (12.04) . . . [and] anxiety-related disorders (12.06) . . . . Each listing . . . consists of a statement describing the disorder(s) addressed by the listing, paragraph A criteria (a set of medical findings), and paragraph B criteria (a set of impairment-related functional limitations). There are additional functional criteria (paragraph C criteria) in . . . 12.04[] and 12.06 . . . . We will assess the paragraph B criteria before we apply the paragraph C criteria. We will assess the paragraph C criteria only if we find that the paragraph B criteria are not satisfied. We will find that you have a listed impairment if the diagnostic description in the introductory paragraph and the criteria of both paragraphs A and B (or A and C, when appropriate) of the listed impairment are satisfied.
>
> The criteria in paragraph A substantiate medically the presence of a particular mental disorder. Specific symptoms, signs, and laboratory findings in the paragraph A criteria of any of the listings in this section cannot be considered in isolation from the description of the mental disorder contained at the beginning of each listing category. Impairments should be analyzed or reviewed under the mental category(ies) indicated by the medical findings. . . .
>
> The criteria in paragraphs B and C describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity. The functional limitations in paragraphs B and C must be the result of the mental disorder described in the diagnostic description, that is manifested by the medical findings in paragraph A.

20 C.F.R. § 404 app. 1, 12.00(A).

After finding that Plaintiff suffers from three severe impairments—major depressive disorder with psychotic features, obsessive compulsive disorder, and anxiety disorder—, the ALJ analyzed Plaintiff's impairments under listings 12.04 and 12.06. R. at 14-15. Listing 12.04 states:

> Affective Disorders: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.
>
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

20 C.F.R. § 404 app. 1, 12.04. Similarly, Listing 12.06 states:

> Anxiety Related Disorders: In these disorders anxiety is either the predominant disturbance or it is experienced if the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders.
>
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied.

*Id.* at 12.06.

Plaintiff takes issue with the ALJ's analysis of paragraph B under 12.04 and 12.06, which, to be satisfied, requires that the medically-documented disorder found under paragraph A of each listing "result[s] in at least two of the following: 1. [m]arked restriction of activities of daily living;[] 2. [m]arked difficulties in maintaining social functioning;[] 3. [m]arked difficulties in maintaining concentration, persistence, or pace; or 4. [r]epeated episodes of decompensation, each of extended duration." *Id.* at 12.04(B), 12.06(B). The introductory language to listing 12.00 clarifies that paragraph B is a measure of the severity of the functional limitations imposed by the claimant's mental impairment, which is analyzed using the four criteria listed above. *Id.* at 12.00(C). It further clarifies:

> Where we use "marked" as a standard for measuring the degree of limitation, it means more than moderate but less than extreme. A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with your ability to function independently, appropriately, effectively, and on a sustained basis.

*Id.*

Plaintiff asserts that the ALJ's review of his "activities of daily living" and "social functioning"—the first two criteria—was improperly conducted. The introductory language to listing 12.00 offers further guidance regarding how to properly analyze "activities of daily living" as follows:

> Activities of daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office. *In the context of your overall situation, we assess the quality of these activities by their independence, appropriateness, effectiveness, and sustainability. We will determine the extent to which you are capable of initiating and participating in activities independent of supervision or direction.*
>
> We do not define "marked" by a specific number of different activities of daily living in which functioning is impaired, but by the nature and overall degree of interference with function. For example, if you do a wide range of activities of daily living, we may still find that you have a marked limitation in your daily activities if you have serious difficulty performing them without direct supervision, or in a suitable manner, or on a consistent, useful, routine basis, or without undue interruptions or distractions.

*Id.* at 12.00(C)(1) (emphasis added). It offers further guidance regarding how to properly analyze "social functioning" as follows:

> *Social functioning refers to your capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals.* Social functioning includes the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers. You may demonstrate impaired social functioning by, for example, a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation. You may exhibit strength in social functioning by such things as your ability to initiate social contacts with others, communicate clearly with others, or interact and actively participate in group activities. *We also need to consider*

8

> *cooperative behaviors, consideration for others, awareness of others' feelings, and social maturity.* Social functioning in work situations may involve interactions with the public, responding appropriately to persons in authority (e.g., supervisors), or cooperative behaviors involving coworkers.
>
> We do not define "marked" by a specific number of different behaviors in which social functioning is impaired, but by the nature and overall degree of interference with function. For example, if you are highly antagonistic, uncooperative, or hostile but are tolerated by local storekeepers, we may nevertheless find that you have a marked limitation in social functioning because that behavior is not acceptable in other social contexts.

*Id.* at 12.00(C)(2) (emphasis added).

The ALJ summarized his review of and conclusions regarding Plaintiff's "activities of daily living" and "social functioning" as follows:

> In activities of daily living, [Plaintiff] has mild restriction. He cares for his personal hygiene needs without difficulty. [Plaintiff] is responsible for the household finances, mowing the grass, doing the laundry, and caring for his goats. He is able to drive a car and shop for groceries. [Plaintiff] enjoys watching television, reading, and working puzzles. He attends church three times a week . . . .
>
> In social functioning, [Plaintiff] has mild difficulties. He goes outside daily, drives a car, shops for food, and pays the bills. [Plaintiff] attends church three times a week. He gets along with authority figures. [Plaintiff] has never been fired . . . . During an August 2010 neuropsychological evaluation, [Plaintiff] was cooperative and rapport was easily established . . . .

R. at 15.

Plaintiff alleges that, because the ALJ did not directly address the independence, appropriateness, effectiveness, and sustainability of Plaintiff's "activities of daily living" and "social functioning," the ALJ's analysis of these areas was improper, and thus, this case should be remanded with the direction that the ALJ make these specific findings. The Court disagrees.

Importantly, the very nature of the ALJ's questioning of Plaintiff at the hearing and of the questions Plaintiff answered on the two Function Reports from June 30, 2010, and November 5, 2010,—on which the ALJ heavily relied—focuses on whether Plaintiff's behaviors in these areas

are independent, appropriate, effective, and sustainable. *See* R. at 32-62, 176-85, 203-10. For

instance, at the hearing, the ALJ asked Plaintiff:

> Tell me about a typical day around the house? How do you spend the typical day?
> . . . How about breakfast and lunch? . . . [D]o you make it yourself? . . . And what
> do you make for yourself? . . . [W]hy is [your wife] the cook for dinner? . . . Are
> you taking care of yourself every day in terms of personal needs, getting dressed,
> shaving, that kind of thing? . . . Do you ever need reminders?

*Id.* at 45-47, 52. He also directly asked the Plaintiff, "Why couldn't you do a job that was very

simple that didn't require you to be around people?" *Id.* at 48. The ALJ further inquired:

> How about socially? Do you have any friends? Do you visit with people? Do they
> call you? Do you call them? . . . What happened to your friends? . . . Are you ever
> not able to go to church because of your symptoms? . . . Do your symptoms every
> [sic] get in the way of any other planned activity? . . . How many miles do you
> drive per week on average?

*Id.* at 52-53, 62. Both Function Reports ask:

> With whom do you live? . . . Describe what you do from the time you wake up
> until going to bed. . . . Do you take care of anyone else . . . ? . . . Does anyone
> help you care for other people or animals? . . . Explain how your . . . . conditions
> affect your ability to [d]ress[,] [b]athe[, etc.] . . . . List household chores, both
> indoors and outdoors, that you are able to do. . . . How much time does it take
> you, and how often do you do each of these things? . . . Do you need help or
> encouragement doing these things? . . . How often do you go outside? . . . When
> going out, can you go out alone? . . . Do you spend time with others? . . . List the
> places you go on a regular basis. . . . Do you need to be reminded to go places?
> . . . How often do you go and how much do you take part? . . . Do you need
> someone to accompany you? . . . Do you have any problems getting along with
> family, friends, neighbors, or others? . . . How well do you get along with
> authority figures? . . . Have you ever been fired or laid off from a job because of
> problems getting along with other people?

*Id.* at 176, 179-82, 203-09. In light of this extensive questioning which goes to the very heart of

whether Plaintiff's "activities of daily living" and "social functioning" are independent,

appropriate, effective, and sustainable, the Court **FINDS** that the ALJ applied the correct legal

standard in his analysis of these criteria.

10

Further, in light of Plaintiff's answers to these questions[2] and the ALJ's properly-reached finding that Plaintiff's statements regarding the frequency, severity, and liming effects of his symptoms are less than credible, the Court **FINDS** that the ALJ's conclusions that Plaintiff experiences only mild restriction in his "activities of daily living" and mild difficulties in his "social functioning" are supported by substantial evidence. In fact, the Court has difficulty seeing how the ALJ could have found that Plaintiff's impairments resulted in a "marked" restriction of "activities of daily living" or "marked" difficulties in maintaining "social functioning," as required by the paragraph B criteria under listings 12.04 and 12.06 and as defined under listing 12.00.

## IV.    Conclusion

For the reasons above, the Court **ADOPTS** the Proposed Findings and Recommendations of the Magistrate Judge, ECF No. 11, **DENIES** Plaintiff's motion for summary judgment as articulated in his brief, ECF No. 7, **GRANTS** Defendant's motion for summary judgment as articulated in her brief, ECF No. 10, and **AFFIRMS** the final decision of the Commissioner of the Social Security Administration.

---

[2] For instance, Plaintiff stated that he regularly makes his own breakfast and lunch, cares for his own personal hygiene, does the laundry, feeds his goats, and mows the grass, without needing assistance or reminders. R. at 46-47, 179-80, 185, 204-05. Plaintiff further stated that he drives, pays the bills, attends church three times per week, and goes grocery shopping at least once every two weeks. *Id.* at 179, 182, 206-07. Plaintiff also stated that he has no problems getting along with family, friends, neighbors, authority figures, or others. *Id.* at 183-84, 208-09. Additionally, Plaintiff stated that a neighbor drove him to the hearing. *Id.* at 62. When asked what happened to his friends, Plaintiff simply replied, "Well I just don't see them because I don't go over there where they're working at." *Id.* at 53. Plaintiff also stated that he and his wife go out to dinner once a month, and when asked whether his symptoms get in the way of these planned dinners, Plaintiff responded, "At times they get in the way[,] but I still force myself and go." *Id.* at 53-54.

The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel of record and any unrepresented parties.

ENTER:        March 26, 2014

ROBERT C. CHAMBERS, CHIEF JUDGE

12